Filed 11/30/22  First Student v. San Francisco Unified School District CA1/1

**NOT TO BE PUBLISHED IN OFFICIAL REPORTS**

California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

FIRST APPELLATE DISTRICT

DIVISION ONE

| | |
|---|---|
| FIRST STUDENT, INC.,<br><br>　　　Plaintiff and Appellant,<br><br>v.<br><br>SAN FRANCISCO UNIFIED<br>SCHOOL DISTRICT,<br><br>　　　Defendant and Respondent. | A163368<br><br>(San Francisco City & County<br>Super. Ct. No. CPF-21-517381)<br><br>ORDER MODIFYING OPINION<br><br>[NO CHANGE IN JUDGMENT] |

THE COURT:

　　　It is ordered that the opinion filed herein on November 22, 2022, be modified as follows:

　　　　　1.  On page 1, in the title, add "and Respondent" after "Defendant."

　　　There is no change in the judgment.

Dated:

　　　　　　　　　　　　　　　　　　　　　_____
　　　　　　　　　　　　　　　　　　　　　Margulies, Acting P.J.

1

Filed 11/22/22  First Student v. San Francisco Unified School District CA1/1 (unmodified opinion)
**NOT TO BE PUBLISHED IN OFFICIAL REPORTS**

California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

FIRST APPELLATE DISTRICT

DIVISION ONE

| | |
|---|---|
| FIRST STUDENT, INC.,<br><br>       Plaintiff and Appellant,<br><br>v.<br><br>SAN FRANCISCO UNIFIED<br>SCHOOL DISTRICT,<br><br>       Defendant. | A163368<br><br>(City and County of San<br> Francisco Super. Ct. No. CPF-<br> 21-517381) |

First Student, Inc. (First Student) appeals from an order denying its petition for writ of mandate challenging San Francisco Unified School District's (SFUSD) award of a transportation contract to Zūm Services, Inc. (Zum).  First Student asserts Zum should have been deemed nonresponsible because of its alleged trade secret misappropriation, SFUSD failed to properly investigate First Student's allegations of misconduct, and Zum's proposal was not responsive because it did not have collective bargaining agreements (CBAs) in place at the time of its bid.  First Student also alleges on appeal that the trial court erred by excluding extra-record evidence of Zum's misconduct.  We disagree and affirm the order.[1]

---

[1] On June 6, 2022, SFUSD filed an unopposed request for judicial notice as to the register of action in the proceeding *First Student, Inc. v. Mark*

# I. BACKGROUND

## A. *Factual Background*

In 2020, SFUSD issued a request for proposal (RFP) for school transportation services. The RFP set forth various requirements and details of the selection process, including requiring "a description of any and all collective bargaining agreements in place, and/or labor negotiations underway, with the Contractor's employees or their representatives . . . ." The RFP required all bids to be submitted by December 14, 2020.

On December 10, 2020, First Student submitted a written proposal in response to the RFP. Mark Frith, who was then employed as First Student's operations manager, was significantly involved in preparing First Student's bid and submitting it to SFUSD. The day after First Student's bid was submitted to SFUSD, Frith resigned from his employment. First Student alleges, on or around the time he resigned, Frith forwarded to his personal email address certain confidential records of First Student, including a contract analysis tool model, First Student's complete bid submission to SFUSD, First Student's pricing schedule for its SFUSD bid, and First Student's SFUSD-specific corporate narrative. At that same time, Frith signed an agreement to work with Zum. Between mid-November and mid-December, Frith and Zum conducted numerous telephone calls and exchanged numerous texts.

On December 14, 2020, Zum submitted its proposal in response to the RFP. Vivek Garg, the Chief Operational Officer of Zum, testified he was primarily responsible for Zum's bid and Frith neither saw it nor had any input into it.

---

*Frith et al.* (Case No. CGC-21-588802). We grant the request. (Evid. Code, § 452, subd. (d).)

On January 6, 2021, Zum gave an oral presentation to SFUSD on its bid proposal. Frith participated in a portion of that presentation. First Student stated it learned of Frith's participation, and his employment with Zum, on January 7, 2021. First Student then provided its oral presentation to SFUSD on January 8, 2021.

On January 12, 2021, First Student filed a lawsuit against Frith, alleging (1) breach of contract; (2) breach of duty of confidence; (3) breach of duty of loyalty; (4) unfair competition; (5) misappropriation of trade secrets; and (6) computer fraud (trade secret litigation).[2] First Student also sought a temporary restraining order (TRO).

On January 19, 2021, SFUSD informed the bidders of its intent to award the School Transportation Services RFP to Zum following its best value evaluation.

On January 25, 2021, the trial court granted the TRO. The order stated in relevant part that Frith "improperly took First Student's confidential, proprietary, and/or potentially trade secret materials," and "First Student has shown that it will likely succeed on the merit of its trade secret claims" and suffer harm without such relief. Correspondence from First Student regarding the TRO was sent to SFUSD.

On January 26, 2021, First Student filed a bid protest of the contract award to Zum. Its protest asserted SFUSD "waived several material RFP requirements," including (1) "the requirement that Zūm maintain a CBA"; (2) "that Zum demonstrate extensive prior experience"; (3) "that offerors shall demonstrate that they are maintaining a vehicle yard in compliance with California Highway Patrol standards"; and (4) "that offerors have certain

---

[2] An amended complaint added Zum as a defendant, and added claims for civil conspiracy and intentional interference with contractual relations.

3

levels and types of insurance in place." First Student also argued SFUSD failed to comply with its own evaluation criteria and scoring rubric. Finally, First Student alleged the procurement process was tainted by Zum and Frith's collusion. It asserted Frith and Zum's COO texted and called each other numerous times, Frith forwarded to his personal email address confidential information about the cost model, pricing, and proposal for the SFUSD contract, and submitted First Student's proposal to SFUSD while then participating in Zum's oral presentation to SFUSD shortly after leaving First Student. The bid protest also attached various exhibits including: (1) First Student's trade secret complaint filed on January 12, 2021 against Frith; (2) First Student's motion for a temporary restraining order; (3) the transcript of the hearing on the request for a temporary restraining order; and (4) the court's order granting the temporary restraining order and issuing an order to show cause why a preliminary injunction should not issue.

SFUSD rejected First Student's bid protest in its entirety. As relevant to this appeal, SFUSD concluded the trade secret dispute between First Student and Frith did not preclude it from awarding the contract to Zum because "neither [SFUSD] nor Zum are parties to the dispute, and First Student provides no legal authority that its lawsuit against its former employee impacts [SFUSD's] RFP process or precludes award of a contract." SFUSD further noted that while First Student provided a copy of the TRO and alleged the "procurement process was 'tainted' by 'collusion and conflicts of interest,' " First Student "provide[d] no evidence that Zum had access to or relied upon any of First Student's confidential or proprietary information in its Proposal."

First Student continued to send information to SFUSD regarding the trade secret litigation. First Student provided information regarding the

4

TRO, argued Frith misappropriated trade secrets, claimed SFUSD should have been aware of Frith's conflict of interest, and asserted Zum misled SFUSD regarding personnel. First Student also informed SFUSD it initiated litigation against both Frith and Zum regarding their alleged collusion. The letter included multiple attachments, including its complaint in the trade secret litigation and the motion, hearing, and order on the TRO However, the San Francisco Board of Education approved the contract award to Zum at a February 23, 2021 public meeting.

## B.  *Procedural Background*

Following SFUSD's denial of its bid protest, First Student filed a petition for writ of mandate against SFUSD.[3] The petition alleged SFUSD improperly waived the requirements for maintaining CBAs with non-management employees, prior relevant experience, and a California Highway Patrol certified bus yard. The petition further asserted SFUSD ignored Zum's collusion and conflict of interest.

In connection with its petition, First Student filed an ex parte application for a TRO and preliminary injunction to restrain SFUSD from implementing the transportation contract with Zum. The trial court denied the TRO, but issued an order to show cause as to the preliminary injunction.

Following briefing, the court ultimately denied First Student's request for a preliminary injunction without prejudice. The court did not believe First Student had established irreparable harm, and instead opted to proceed expeditiously to the merits.

First Student also filed a motion to augment the record. First Student argued evidence of Zum's misconduct, which relates to the "responsible

---

[3] The petition also included a complaint for declaratory relief against SFUSD, the San Francisco Board of Education, and Dr. Vincent Matthews.

5

bidder" requirement for the transportation contract, was not reasonably available during the administrative proceedings due to Zum's instructions to Frith to delete evidence of their communications. First Student argued extra-record evidence should be admissible because it addressed Zum's trustworthiness and whether the award was made "without favoritism, fraud or corruption," which must be considered when identifying a "responsible" bidder under Education Code section 39802 and Public Contract Code section 20111.

The trial court denied First Student's motion to augment with extra-record evidence that was not before SFUSD when it awarded the contract.[4] The court concluded the proposed extra-record evidence did not fall within the narrow exceptions for evidence that " ' "provides background information regarding the quasi-legislative agency decision, . . . establishe[s] whether the agency fulfilled its duties in making the decision, or assist[s] the trial court in understanding the agency's decision." ' " Rather, the court explained, "First Student seeks to introduce the extra-record evidence for . . . impermissible purposes—i.e., to contradict evidence upon which [SFUSD] relied showing that Zum was a responsible bidder, and to raise a question regarding the wisdom of its decision in so finding." Accordingly, the court found the proposed evidence inadmissible.

Following briefing and a hearing on the merits, the court denied First Student's petition. The court concluded SFUSD did not act "arbitrarily or capriciously in awarding the contract to Zum." The court first rejected First Student's argument that Zum's bid was non-complying because it did not

---

[4] The court granted the motion as to one document—a February 18, 2021 letter from First Student to members of the San Francisco Board of Education—that SFUSD conceded should have been part of the administrative record.

6

have pre-existing CBAs. Specifically, the court noted Zum complied with the CBA provision "by committing to comply with the 'first hire' provision in the contract that requires a new contractor to offer to hire the drivers, mechanics and dispatchers of the outgoing contractor (who are currently covered by an existing CBA)" and " 'maintain collective bargaining agreements with workforce.' " The court also explained SFUSD could waive non-material deviations, and First Student did not present any reason for why entering its CBAs after, rather than before, bidding would provide a competitive advantage.

Second, the court rejected First Student's argument that Zum lacked relevant prior experience because past contracts were either subcontracted to other companies or utilized independent contractors as drivers. The court noted the number of school partnerships, students transported, and miles driven in Zum's bid materials, and concluded "nothing in the RFP specifies that such prior experience must have been provided through a particular business or employment model."

Third, the court concluded SFUSD reasonably concluded Zum's bid met the requirements of maintaining a CHP-compliant vehicle yard. The court noted the RFP language "contemplate[d] that such certification may follow, rather than precede, the bidding process."

Finally, the court concluded the trade secret misappropriation claims did not provide a basis for writ relief. It noted First Student "belatedly asserted that [SFUSD] had a duty to investigate" by failing to raise the issue at its January 8 presentation or any time prior to the January 19 issuance of its Intent to Award the contract to Zum, and only first requested SFUSD do so "just days before the February 23, Board meeting." The court further noted First Student cited no relevant authority that SFUSD had any duty to

7

conduct such an investigation, that its failure to do so justifies vacating the contract award, or that due process requires a hearing on such allegations. The court concluded a responsible bidder is one who can perform the contract as promised, and the alleged conflict of interest does not impact this analysis. The court again declined to consider extra-record evidence, and explained First Student may have a remedy in the trade secret litigation if its allegations of collusion are proven.

First Student timely appealed from the order denying its petition.

## II.  DISCUSSION

### A.  *Standard of Review*

" 'Appellate review of the award of a public contract is governed by certain well-established principles.  In a mandamus action arising under Code of Civil Procedure section 1085, we limit our review to an examination of the proceedings before the agency to determine whether its findings and actions are supported by substantial evidence. [Citations.]  "Our review is limited to an examination of the proceedings to determine whether the [agency's] actions were arbitrary, capricious, entirely lacking in evidentiary support or inconsistent with proper procedure.  There is a presumption that the [agency's] actions were supported by substantial evidence, and [petitioner/plaintiff] has the burden of proving otherwise.  We may not reweigh the evidence and must view it in the light most favorable to the [agency's] actions, indulging all reasonable inferences in support of those actions. [Citations.]  Mandamus is an appropriate remedy to compel the exercise of discretion by a governmental agency, but does not lie to control the exercise of discretion unless under the facts, discretion can only be exercised in one way. [Citations.]" [Citation.]' " (*Cypress Sec., LLC v. City & Cnty. of San Francisco* (2010) 184 Cal.App.4th 1003, 1010.)

8

## B. Relevant Statutory Provisions

"The amount of leeway a public entity has in awarding a contract is governed by the statutory or municipal law framework applying to that contract." (*Great W. Contractors, Inc. v. Irvine Unified Sch. Dist.* (2010) 187 Cal.App.4th 1425, 1447 (*Great West Contractors*).) "Thus, where a statute requires a public entity to award a contract to the lowest responsible bidder, the courts have been vigilant in not excusing attempts by public entities to circumvent that requirement. [Citations.] [¶] By contrast, where a statute or city charter specifically contemplated discretion on the part of the public entity to look at factors in addition to the monetary benefit of the bid, awards to other than the best monetary bidders have been upheld." (*Id.* at p. 1448.)

As relevant here, Education Code section 39802 provides for the contracting of public transportation services by school districts. Section 39802 provides in relevant part "the governing board shall, whenever an expenditure of more than ten thousand dollars ($10,000) is involved, secure bids pursuant to Sections 20111 and 20112 of the Public Contract Code." Section 39802 also expressly excuses school districts from contracting with the lowest bidder. (Educ. Code, § 39802; see also *Education & Recreational Services, Inc. v. Pasadena Unified Sch. Dist.* (1977) 65 Cal.App.3d 775, 792 ["District had the right to use judgment and discretion in awarding the contract and was not bound by the lowest bidder provided it first determined that the prevailing bidder could supply the better service under the enunciated standard."].) However, Public Contracts Code section 20111 requires that any contract be awarded to a "responsible bidder." (Pub. Cont. Code, § 20111, subd. (a)(2).)

9

## C. *Whether Zum Qualifies as a Responsible Bidder*

First Student argues SFUSD abused its discretion in awarding the RFP to Zum because it had a duty to investigate the allegations of collusion between Frith and Zum. It further contends the trial court was required to consider evidence of Zum's lack of responsibility when proffered below. We disagree.

### 1. *Meaning of "Responsible Bidder"*

As an initial matter, First Student's petition raises a question regarding the scope of conduct encompassed within the phrase "responsible bidder." Public Contracts Code section 1103 defines "responsible bidder" as "a bidder who has demonstrated the attribute of trustworthiness, as well as quality, fitness, capacity, and experience to satisfactorily perform the public works contract." Cases discussing this phrase have emphasized that "responsibility means the fitness, quality and capacity of the bidder to satisfactorily perform the proposed work." (*Taylor Bus Service, Inc. v. San Diego Bd. of Educ.* (1987) 195 Cal.App.3d 1331, 1341, fn.4 (*Taylor Bus*); see also *D.H. Williams Constr., Inc. v. Clovis Unified Sch. Dist.* (2007) 146 Cal.App.4th 757, 763 (*D.H. Williams*) ["An agency has discretion to determine whether a low bidder is 'responsible,' that is, whether the bidder has the fitness, quality, and capacity to perform the proposed work satisfactorily."].)

In *Great West Contractors*, the Fourth District Court of Appeal discussed in detail the meaning of "responsibility." (*Great West Contractors, supra*, 187 Cal.App.4th at p. 1451.) The court noted the "emphasis on the personal qualities of the bidder." (*Ibid.*) However, the personal qualities set forth in case law related directly to the party's ability to perform the contract. (*Ibid.,* citing *City of Inglewood-L.A. County Civic Center Auth. v. Superior*

10

*Court* (1972) 7 Cal.3d 861 (*City of Inglewood*) [Supreme Court "shifted the emphasis . . . from the nature of the 'offer' to a 'product' not being satisfactory."] Likewise, the Supreme Court in *City of Inglewood* explained prior cases "hold that the lowest bidder was properly rejected as not responsible either because . . . his product was not satisfactory or . . . because he was found to have provided poor workmanship in another public project." (*City of Inglewood*, at p. 867, fn. 5.)

To the extent First Student asserts *Great West Contractors* supports a broader interpretation of "responsibility," it is mistaken. While *Great West Contractors* acknowledged agencies must examine "the personal qualities of the bidder," it did so in the context of the bidder's ability to perform the contract. Likewise, *Eel River Disposal & Resource Recovery, Inc. v. County of Humboldt* (2013) 221 Cal.App.4th 209 (*Eel River*), another case on which First Student relies, explained "the 'lowest responsible bidder requirement' imposes on governmental agencies that solicit bids for public contracts a duty to evaluate bidders' possession of such attributes in a reasonable way *on the basis of specified criteria timely made known to bidders and the general public.*" (*Id.* at p. 221 (italics added); see also *ibid.*, citing American Bar Association (ABA), The 2000 Model Procurement Code for State and Local Governments (2000) § 3-101 [a responsible bidder possesses "the capability in all respects of bidders to perform fully the contract requirements, and the integrity and reliability which will assure good faith performance"].)[5]

As with *Great West Contractors* and *Eel River*, the record indicates SFUSD evaluated bidders' "responsibility" based on certain requirements set

_____

[5] While First Student correctly notes a responsibility determination may be dependent "on information received outside the bidding process" (*Taylor Bus*, *supra*, 195 Cal.App.3d at p. 1342), such outside information relates to a bidder's ability to perform the contract. (*Id.* at p. 1341, fn. 4.)

11

forth in the RFP regarding their ability to fulfill the terms of the contract. Section 4.2 of the RFP, entitled "Essential Qualification Requirements," set forth the specific criteria from which SFUSD would assess a bidder's responsibility. That section provided, "[i]n order [for the bidder] to be found sufficiently qualified and responsible in response to this RFP, a Contractor must at a minimum demonstrate to the District that it meets each of the following Essential Qualification Requirements: [¶] (a) Size and scale of the Contractor are sufficient to provide the vehicles, personnel, and business services required to support the scope of work; [¶] (b) Contractor has proper incorporation and licenses to do business in the State of California. [¶] (c) Financial statements indicate ability to provide services on which the Contractor is bidding . . . ; [¶] (d) Proposed fleet meets all minimum vehicle and technology requirements; and [¶] (e) Contractor maintains collective bargaining agreements with its non-management workforce." These requirements directly relate to a bidder's ability to perform the contract.

First Student has not identified any basis for requiring SFUSD to evaluate a bidder's responsibleness beyond their ability to fulfill the contract. Nor has First Student identified any evidence—either that it has discovered or anticipates discovering—that would call into question Zum's ability to perform the transportation contract. Rather, the evidence provided by First Student to SFUSD indicates Frith had unrestricted access to confidential information, including bidding strategy, pricing strategy, bid-pricing models, and technology initiatives, and Frith had taken confidential information prior to leaving First Student's employment resulting in a TRO against Frith. While the allegations of trade secret misappropriation are undoubtedly concerning, none of this information impacts the "fitness, quality and

12

capacity" of Zum to "satisfactorily perform the proposed work." (See *Taylor Bus*, *supra*, 195 Cal.App.3d at p. 1341, fn.4.)

## 2. Duty to Investigate

First Student next argues SFUSD had a duty to investigate First Student's allegations of misconduct by Frith and Zum. However, this argument largely hinges on First Student's position that trade secret misappropriation impacts whether a bidder is "responsible." As discussed in the prior part, trade secret misappropriation is not a relevant factor in making this determination. Moreover, we note First Student has not identified any authority that would impose on SFUSD a duty to investigate.[6]

Where a public agency is required to award a contract to the lowest responsible bidder, "the agency is required to afford a significant level of due process to the bidder, including notice and an opportunity to respond." (*D.H. Williams*, *supra*, 146 Cal.App.4th at pp. 763–764.) Such a right is provided in relevant part because "the declaration of nonresponsibility may have an adverse impact on the professional or business reputation of the bidder." (*Id.* at p. 764.) In other words, the *bidder* who is deemed nonresponsible is entitled to certain due process rights. However, we are unaware of any authority that grants one competitor the right to demand a hearing as to another competitor's responsibility. Nor has First Student cited any such

---

[6] First Student cites *Eel River*, *supra*, 221 Cal.App.4th 209 to argue that agencies are required to " 'evaluate bidders' possession' of responsible attributes." However, *Eel River* provides "the 'lowest responsible bidder requirement' imposes on governmental agencies that solicit bids for public contracts a duty to evaluate bidders' possession of such attributes in a reasonable way on the basis of specified criteria timely made known to bidders and the general public"—i.e., their ability to perform the contract. (*Id*. at p. 221.) It does not impose a general duty to investigate any allegations raised by competitors.

authority.  Rather, the cases on which it relies merely emphasize the right of a bidder to offer evidence as to its own responsibility.  (See, e.g., *Boydston v. Napa Sanitation Dist.* (1990) 222 Cal.App.3d 1362, 1370 ["the finding of qualification should be made only after the low (or high) bidder has an opportunity to rebut adverse evidence of qualification and present additional evidence of qualification."]; *City of Inglewood*, *supra*, 7 Cal.3d at p. 871 ["prior to awarding a public works contract to other than the lowest bidder, a public body must notify the low monetary bidder of any evidence reflecting upon his responsibility received from others or adduced as a result of independent investigation, afford him an opportunity to rebut such adverse evidence, and permit him to present evidence that he is qualified to perform the contract."].)

First Student also relies on two federal cases to argue that agencies may abuse their discretion by failing to investigate claims of bidder misconduct.  However, both cases are distinguishable.  In *NetStar-1 Government Consulting, Inc. v. United States* (Fed. Cl. 2011) 101 Fed.Cl. 511, the bidding process was governed by the Federal Acquisition Regulation (FAR), which required contracting officers to identify potential organizational conflicts of interest and evaluate mitigation proposals.  (*Id.* at p. 519.)  The plaintiff argued a conflict existed because the winning bidder had access to certain governmental databases, which provided an unfair advantage and the mitigation steps required by FAR had not been properly executed.  (*Id.* at pp. 519–521.)  The court agreed and enjoined performance on the contract. (*Id.* at p. 526.)  Here, conversely, SFUSD did not fail to follow any regulations regarding the identification and mitigation of certain potential conflicts.

Rather, SFUSD was merely required to follow the criteria for responsibility set forth in the RFP, and they did so.[7]

Likewise, in *DynCorp International, LLC v. United States* (Fed. Cir. 2018) 757 Fed.Appx. 927, the plaintiff asserted the government acted arbitrarily and capriciously in refusing to disqualify the winning bidder for allegedly obtaining and using a competitor's proprietary information. (*Id.* at p. 930.) The plaintiff argued "the contracting officer was unduly concerned about whether there had been a violation of the Procurement Integrity Act . . . and failed to assess adequately whether [the winning bidder] should be disqualified for having created an 'appearance of impropriety.' " (*Id.* at p. 931.) The Federal Circuit rejected this argument and upheld the decision, concluding the contracting officer reasonably found the materials were neither confidential nor used to gain a competitive advantage. (*Ibid.*) Here, First Student has not alleged a violation of any equivalent law or identified any competitive advantage gained by Zum through the alleged conduct. And the case does not suggest public agencies have a specific duty to investigate under California law.[8]

Finally, First Student contends in passing that the alleged misconduct impacted the competitiveness of the bidding process more generally by "corrupt[ing] the fairness of the bidding process on both sides."

---

[7] We address First Student's argument that substantial evidence did not support Zum meeting the CBA requirement in Part II.D.

[8] Even if this court concluded (1) SFUSD had a duty to investigate, and (2) SFUSD had failed to consider the allegations of misconduct, First Student has not demonstrated the result of such an investigation would have altered the contract award. As discussed in Part II.C.1., the alleged trade secret misappropriation would not have impacted the "responsibility" analysis under Section 4.2 of the RFP.

15

However, First Student does not expand on this point or provide any meaningful analysis to support its claim. (*Hernandez v. First Student, Inc.* (2019) 37 Cal.App.5th 270, 277 [" 'When an appellant raises an issue "but fails to support it with reasoned argument and citations to authority, we treat the point as waived." ' "].)

Moreover, we cannot conclude SFUSD acted arbitrarily or capriciously in determining otherwise. SFUSD concluded the evidence presented by First Student "provide[d] no evidence that Zum had access to or relied upon any of First Student's confidential or proprietary information in its Proposal." And the record contains evidence that supported SFUSD's conclusion. For example, Frith stated he first saw Zum's proposal on December 23—nine days after it was submitted. Garg testified neither he nor anyone else responsible for preparing Zum's bid accessed or viewed First Student's bid. Likewise, Garg testified Frith did not review Zum's bid or contribute to its preparation. The record does not show Zum was even aware Frith had taken First Student's information, let alone used it to prepare its bid.[9] Accordingly, the record contains substantial evidence to support SFUSD's conclusion that the allegations of misconduct did not undermine the competitive bidding process.

### 3. *First Student's Right to Present Extra-Record Evidence*

First Student then argues it was entitled to conduct its own investigation into Zum's alleged misconduct and present such evidence to the trial court. It asserts the court abused its discretion by limiting its review to the administrative record and excluding any extra-record evidence.

---

[9] Moreover, we note the TRO was granted in the trade secret litigation based on Frith's improper acquisition of the materials rather than any alleged disclosure to Zum.

16

First, as an initial matter, First Student fails to identify the exact materials it asserts the trial court erred in excluding from the record. First Student's brief merely references "the contested evidence," without any relevant citations to the record. This failure alone is sufficient to justify denying the appeal as to this issue. (*Regents of University of California v. Sheily* (2004) 122 Cal.App.4th 824, 826, fn. 1 ["[u]pon the party's failure" to comply with California Rule of Court rule 8.204 "the appellate court need not consider or may disregard the matter"].) " 'It is not incumbent upon this court to search a record . . . to determine a point raised in this manner.' " (*Schmidlin v. City of Palo Alto* (2007) 157 Cal.App.4th 728, 738.)

Moreover, as discussed above, we disagree any proposed evidence regarding trade secret misappropriation is relevant to the "responsible bidder" determination. Case law has defined responsibility to specifically relate to a bidder's ability to fulfill the contract. (See Part II.C.1., *ante*.) To the extent such a determination is dependent on information obtained from outside the bidding process, the inquiry still revolves around the bidder's ability to perform the contract. (See, e.g., *Taylor Bus*, *supra*, 195 Cal.App.3d at p. 1341, fn. 4.) First Student has made no argument or showing that any of the excluded evidence relates to Zum's ability to perform the contract. Nor have they offered any substantive argument that such evidence demonstrates Zum relied on First Student's confidential information in preparing its bid. Accordingly, First Student has not demonstrated any excluded evidence is relevant to its bid protest or SFUSD's decision thereon.[10]

_____

[10] First Student relies on *Western States Petroleum Assn. v. Superior Court* (1995) 9 Cal.4th 559 to argue extra-record evidence is admissible when it "existed *before* the agency made its decision" and "was not possible in the exercise of reasonable diligence to present this evidence to the agency *before* the decision was made." (See *id.* at p. 578.) It asserts three cases apply this exception when the evidence relates to the fairness of the bidding process:

17

Competitive bidding is "for the purpose of inviting competition, to guard against favoritism, improvidence, extravagance, fraud and corruption, and to secure the best work or supplies at the lowest price practicable, and they are enacted for the benefit of property holders and taxpayers, and not for the benefit or enrichment of bidders . . . ." (*Domar Elec., Inc. v. City of Los Angeles* (1994) 9 Cal.4th 161, 173.) This appeal does not raise issues of corruption by a public entity, but rather is a dispute between two bidders. And First Student has not identified any basis for concluding the alleged misconduct by one bidder harmed the public's interest, such as by inflating costs. Accordingly, we cannot conclude the trial court abused its discretion in declining to allow extra-record evidence when evaluating the petition.[11]

*Nightlife Partners, Ltd. v. City of Beverly Hills* (2003) 108 Cal.App.4th 81 (*Nightlife*); *Richardson v. City and County of San Francisco Police Com.* (2013) 214 Cal.App.4th 671 (*Richardson*); and *Nasha v. City of Los Angeles* (2004) 125 Cal.App.4th 470 (*Nasha*). We find these cases distinguishable. Most notably, none involved bids or unfair conduct between competitors engaged in a bidding process. Rather, these cases involved alleged bias by the agency's decisionmaker. (See, e.g., *Nightlife*, at pp. 86, 89–90 [city attorney, who initially denied petitioner's business renewal application, was providing advice to the city's risk manager, who was conducting the hearing reviewing the denial]; *Richardson*, at p. 684 [city attorney, who was representing the city in a related civil action, was advising commissioner overseeing petitioner's termination hearing]; *Nasha*, at pp. 476–477 [commissioner ruling on development application had not disclosed he authored an article hostile to the project and communicated with a party opposed to the project].) Moreover, none of these cases involved intensive fact-finding but rather very limited factual inquiries. (*Nightlife*, at pp. 89–90 [appropriate to admit evidence of whether ex parte communications occurred]; *Richardson*, at p. 703 [appropriate to admit declaration regarding ethical screens at the city attorney's office]; *Nasha*, at pp. 484–485 [appropriate to consider commissioner's article].)

[11] Because we conclude the trial court did not err in excluding the extra-record evidence, we need not reach First Student's argument that the error was prejudicial.

### D. *Whether Zum Satisfied the RFP Requirements*

First Student contends, regardless of any misconduct, SFUSD erred in awarding the contract to Zum because it did not comply with the CBA requirement in the RFP.

" ' "A basic rule of competitive bidding is that bids must conform to specifications, and that if a bid does not so conform, it may not be accepted. [Citations.]  However, it is further well established that a bid which substantially conforms to a call for bids may, though it is not strictly responsive, be accepted if the variance cannot have affected the amount of the bid or given a bidder an advantage or benefit not allowed other bidders or, in other words, if the variance is inconsequential.  [Citations.]" [Citations.]' " (*Bay Cities Paving & Grading, Inc. v. City of San Leandro* (2014) 223 Cal.App.4th 1181, 1188.)

Here, the RFP lists as an "essential qualification requirement" that the "Contractor maintains collective bargaining agreements with its non-management workforce."  The RFP further states the contractor must provide "A description of all collective bargaining agreements governing the employees who will perform the services required by this RFP."

Zum's proposal states as follows: "Once [the] District award[s] the contract, [Zum] will follow all local laws and negotiate our Collective Bargain agreement with the current union."  The proposal further noted "the staff required to operate [the] SFUSD contract is currently with the incumbent vendor and will be interviewed and offered positions immediately upon the award of the contract (in accordance with Collective Bargain Agreement and First Hire policy of the district). . . . We will enter into a Collective Bargain Agreement and begin recruiting, onboarding and training for all staff immediately after the contract is awarded to ensure a seamless and smooth

19

transition after the current contract ends." First Student claims these representations in Zum's proposal are insufficient to meet the CBA requirement, and instead Zum was required to have pre-existing CBAs in place at the time of its bid.

While Section 4.2 of the contract, entitled "Essential Qualification Requirements," requires that the contractor "maintains" CBAs, that provision must be interpreted with the other language of the RFP and attached contract. The RFP specifically requests CBAs with "the employees who will perform the services required by this RFP." And the RFP also requires new contractors to "first offer to hire, where available" the drivers, Mechanics, and dispatchers of the outgoing contractor. Accordingly, at the time of bidding it is unlikely that a new contractor, such as Zum, would have CBAs with all or most of its labor force.

The RFP recognizes this scenario by requesting that bidders "[p]rovide a description of any and all collective bargaining agreements in place, and/or labor negotiations underway, with the Contractor's employees or their representatives . . . ." Likewise, in Section 5.4, entitled "Personnel," the RFP states, "*To the extent applicable*, Contractor shall submit with their proposal a status report regarding any collective bargaining agreements in place, and/or labor negotiations underway with the Contractor's employees or their representatives . . . ." (Italics added.) In accordance with these provisions, Zum's proposal noted it would enter into a CBA with "the SMART Union and follow the First Hire policy as asked by SFUSF" and summarized discussions with the SMART union regarding staffing for the SFUSD contract.

Likewise, the contract attached to the RFP supports SFUSD's interpretation. The Section 41 of the contract, entitled "Collective Bargaining," provides "*Throughout the term of the Contract*, the Contractor

20

shall maintain collective bargaining agreements with its non-management employees . . . . Specifically, ninety (90) days prior to the opening of school each school year, the Contractor shall provide the District with a report on the current status of the Contractor's employer-employee relations . . . . *No later than ten (10) days prior to opening of school each year the Contractor shall submit to the District a copy of each new or continuing collective bargaining agreement*, as applicable, with the Contractor's employees for the school year. . . ."  (Italics added.)  The contract thus contemplates the contractor maintaining CBAs during the term of the contract, with such CBAs in place at least ten days prior to the start of the school year. Accordingly, SFUSD's interpretation of the RFP as allowing Zum to enter into CBAs after being awarded the contract rather than having such CBAs already in place is supported by the record.

In any event, even if we accepted First Student's position, we agree with the trial court that the timing of entering into the CBAs would constitute an "inconsequential deviation" from the terms of the RFP.  First Student argues failure to comply with the CBA requirement is a material deviation because maintaining CBAs was an "essential qualification."  While ultimately having CBAs with the non-management employees is certainly material, First Student offers no evidence or arguments to support its position that the *timing* of entering into those CBAs is material.  As noted above, a substantially conforming bid may "be accepted if the variance cannot have affected the amount of the bid or given a bidder an advantage or benefit not allowed other bidders . . . .  [Citations.]" [Citations.]' "  (*Bay Cities Paving & Grading, Inc. v. City of San Leandro*, *supra*, 223 Cal.App.4th at p. 1188.) It is unclear how entering into CBAs after being awarded the contract would have impacted Zum's bid amount or provided any other benefit or advantage.

21

And First Student has not identified any such benefit or advantage. Accordingly, Zum's express intent to enter into CBAs adequately satisfied the RFP requirement for such agreements.

## III.  DISPOSITION

The trial court's order denying First Student's petition is affirmed. SFUSD may recover its costs on appeal.  (Cal. Rules of Court, rule 8.278(a)(1), (2).)

_____

Margulies, J.

WE CONCUR:


_____

Humes, P. J.


_____

Devine, J.



A163368